UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF OHIO
WESTERN DIVISION

| | | |
|---|---|---|
| Samuel A. Ashley, Jr., | : | Case No. 1:04-CV-689 |
| | : | Criminal No. 1:02-CR-22 |
| Petitioner, | : | |
| | : | |
| v. | : | Chief U.S. District Judge Beckwith |
| | : | |
| United States of America, | : | |
| | : | |
| Respondent. | : | |

## <u>MEMORANDUM AND ORDER</u>

Petitioner is an inmate in federal custody pursuant to a judgment of conviction entered in this Court on March 31, 2003, for two counts of mail fraud and one count of tax evasion. Petitioner was sentenced to a total of 135 months imprisonment followed by three years of supervised release on each count to run concurrently. Petitioner filed a direct appeal to the United States Court of Appeals for the Sixth Circuit, which affirmed his conviction on March 18, 2004. On October 5, 2004, Petitioner filed a motion under 28 U.S.C. § 2255 to Vacate, Set Aside or Correct Sentence by a Person in Federal Custody (Doc. No. 103). The government has responded (Doc. No. 109). Petitioner has replied (Doc. No. 110). Petitioner then amended his petition (Doc. No. 116), and the government responded (Doc. No. 119). Thereafter, Petitioner filed a further pleading entitled "The Supreme Court's Ruling in Booker Does Apply to the Defendant" (Doc. No. 127) and Defendant's Amendment to his § 2255 (Doc. No. 132).

<u>I.  Analysis</u>

<u>A.  Section 2255 Standard</u>

An action brought pursuant to 28 U.S.C. § 2255 must allege an error that meets the constitutional standards for collateral attack.  A petition properly brought under this section must allege that a sentencing court

    1.    Committed an error of constitutional magnitude;

    2.    Imposed a sentence outside the statutory limits; or

    3.    Proceeded under an error of fact or law which was so fundamental as to render the entire proceedings invalid.

<u>United States v. Addonizio</u>, 442 U.S. 178, 186 (1979); <u>United States v. Davis</u>, 417 U.S. 333, 346 (1974).  A § 2255 motion is not limited to constitutional claims, but a non-constitutional error does not provide a basis for collateral attack unless it involves a "fundamental defect which inherently results in a complete miscarriage of justice."  <u>Hill v. United States</u>, 368 U.S. 424, 428 (1962).  A motion under § 2255 will not serve as a substitute for a direct appeal, and claims that could have been raised on direct appeal, but were not, will not be entertained in a § 2255 proceeding.  <u>See</u> <u>McCrary v. United States</u>, No. 97-3966, 1999 WL 313831 (6th Cir. May 3, 1999).

<u>B.  Ineffective Assistant of Counsel</u>

Petitioner raises a number of claims.  Most of them fall under the general heading

of ineffective assistance of counsel.[1]  The right to counsel guaranteed by the Sixth

Amendment is the right to effective assistance of counsel.  McMann v. Richardson, 397

U.S. 759, 771 n.14 (1970).  The standard for reviewing a claim of effective assistance of

counsel is twofold:

> First, the defendant must show that counsel's performance
> was deficient.  This requires showing that counsel made
> errors so serious that counsel was not functioning as the
> "counsel" guaranteed the defendant by the Sixth
> Amendment.  Second, the defendant must show that the
> deficient performance prejudiced the defense.  This
> requires showing that counsel's errors were so serious
> as to deprive the defendant of a fair trial, a trial
> whose result is reliable.

Strickland v. Washington, 466 U.S. 668, 687 (1984); see also, Blackburn v. Foltz, 828

F.2d 1177 (6th Cir. 1987).  "Because of the difficulties inherent in making the evaluation,

a court must indulge a strong presumption that counsel's conduct falls within the wide

range of reasonable professional assistance; that is, the defendant must overcome the

presumption that, under the circumstances, the challenged action might be considered

sound trial strategy."  Strickland, 466 U.S. at 689.

　　　To establish prejudice, it must be shown that there is a reasonable probability that,

but for counsel's errors, the result of the proceedings would have been different.  Id. at

694.  "A reasonable probability is a probability sufficient to undermine confidence in the

---

[1]The Court notes that Petitioner had the benefit of appellate counsel different from his
counsel before the trial court, who raised no issues based upon ineffective assistance of
Petitioner's trial level counsel, nor does Petitioner claim that his appellate counsel was
ineffective for failing to raise any such issues in his direct appeal.

outcome." Id.  Because Petitioner must satisfy both prongs of the Strickland test to demonstrate ineffective assistance of counsel, if the Court determines that Petitioner has failed to satisfy one prong, it need not consider the other.  Id. at 697.

(1)  Conflict of interest

(a)  Petitioner first claims that his trial counsel suffered from a conflict of interest that, presumably, rendered him incapable of providing the assistance of counsel contemplated by the Sixth Amendment.  Specifically, he cites an incident which occurred at his sentencing hearing on March 26, 2003.

> THE COURT:  ....Mr. Ashley, anything you wish
>
> to say?
>
> THE DEFENDANT:  Your Honor, I'm glad the
>
> whole thing is coming to an end.  Whenever I get out, I will
>
> be able to resume a real life as a citizen, not as a second class
>
> citizen.  I did enter the plea of guilty based upon promises from
>
> the prosecution of the seven year sentence.  They -- that's --
>
> THE COURT:  Mr. Claytor is standing there in disbelief,
>
> and I, having been a member of that office, Mr. Ashley, I know
>
> that they do not promise sentences, because they know that
>
> that's in the hands of the Court.
>
> THE DEFENDANT:  Okay.  He did give two interviews
>
> with the press where he said I was going to get a seven to nine

4

year sentence, and then in one interview that he gives he

says they're not going to prosecute me from the day --[2]

      MR. CLAYTOR:  Your Honor, if I could be heard on this.

I have not given any interviews to any press, and I have not

promised anybody anything.

      THE COURT:  All right.  Hold it, Mr. Claytor, and

I'll give you an opportunity to respond.

      Go ahead, Mr. Ashley.

      THE DEFENDANT:  Okay.  There was an agreement of

seven years.  I'm sorry that they have got amnesia when it came

down to -- you know, everybody wants me to accept responsibility

for what I have done, and I have.  But I'm not getting any-- they

told us be cooperative and none of the things you say is going to

be used against you.  Everything I said got used against me to

up my sentence.

      The case agents could come up here, and we haven't heard

from them.  Let's ask them.  Did you guys tell him that?  They're

going to say yes, because they're not going to lie.

---

    [2]Petitioner's Exhibit U, attached to his original motion in this matter, purports to be an undated Cincinnati Post newspaper article quoting an unnamed government attorney as speculating that Petitioner would receive a sentence in the seven to nine year range, although a sentence up to 15 years was possible.  Petitioner proffers this presumably as newly discovered evidence corroborating his claim of a promised seven year sentence of imprisonment.

Norm was there for all those meetings.

THE COURT:  Mr. Ashley, we have heard from the case agents.  Mr. Ellis did an incredibly thorough presentence investigation report in which he talked to the agents and reported that to me in the report.

THE DEFENDANT:  I understand, but it's not in the report that they're denying that, is it?

THE COURT:  Denying what?

THE DEFENDANT:  That that was the deal, that they weren't going to use anything I said against me.

THE COURT:  There is absolutely no evidence that was the deal.

THE DEFENDANT:  Norm, you were there.  Aren't you an officer?  Can't you say you were there; you heard it?

THE COURT:  I don't think you want your lawyer testifying at this point.

MR. AUBIN:  I can't say because of privilege, Your Honor.

(Doc. No. 81 - Tr. p. 24, l. 19 - p. 26, l. 18)

Petitioner claims that his attorney's refusal to corroborate his version of a plea agreement different from the one he signed and acknowledged at the plea hearing on July

30, 2002, was a conflict of interest.  If it was a conflict of interest, this Court is at a loss to

discern it.  The most likely problem with defense counsel's silence is that, as an officer of

the court, he was unwilling to corroborate his client's misrepresentation to the court.  That

does not rise to the level of a conflict of constitutional portions.  More importantly,

Petitioner's claim is belied by the record in this matter.  The plea agreement specifically

states, "[t]he sentence in this case will be imposed by the court.  There is no agreement as

to what that sentence will be." (Doc. No. 24, p.2).  It continues on page 4, "[t[here have

been no representations or promises from anyone as to what sentence this Court will

impose."  Finally, on page 6, the agreement states that "[t]his document is a complete

statement of the agreement in this case and may not be altered unless done so in writing

and signed by all parties."  At the change of plea hearing, the Petitioner was placed under

oath and he acknowledged "that the Court is not bound by any stipulation of facts

between you and the government, and the Court may, with the aid of the presentence

report, determine the facts relevant to sentencing." (Doc. No. 51, Tr. p.13).  Later in the

course of summarizing the plea agreement for the record, Assistant United States

Attorney Claytor stated "[t]here is no agreement as to what that sentence will be."  (Id. at

16).  Additionally, Assistant United States Attorney Claytor stated that "this document is

a complete statement of the agreement in this case and may not be altered unless done so

in writing and signed by all parties."  (Id. at 19).  At the conclusion of Assistant United

States Attorney Claytor's summary of the plea agreement, the Court inquired "Mr.

Ashley, is that your understanding of the plea agreement."  (Id.)  Petitioner responded

"Yes." (Id.)  The only concern expressed by either Petitioner or his attorney was as to the potential amount of loss, which defense counsel stated "would be argued in the PSI report." (Id.)

The colloquy between the court and Petitioner continued

>THE COURT:  Has anyone made any other or different promise or assurance of any kind that induced you to plead guilty?

>THE DEFENDANT:  No.

>THE COURT:  Do you understand that any recommendation of sentence agreed to by your counsel and the government or any agreement by the government not to oppose the sentence requested by your attorney is not binding on this Court and that you might, on the basis of your guilty plea, receive a more severe sentence than requested or recommended?

>THE DEFENDANT:  Yes.

>THE COURT:  Aside from the plea agreement we have just discussed, has any person, including an officer or agent of the government or any of the lawyers in this case, promised or even suggested that you will receive a lighter sentence or any other form of leniency if you plead guilty?

THE DEFENDANT:  No.

THE COURT:  Is your decision to plead guilty your

own free and voluntary act?

THE DEFENDANT:  Yes, ma'am.  It is in my best

interest to plead guilty.

THE COURT:  Have you been subjected to any

threats or force of any kind which caused you to plead guilty?

THE DEFENDANT:  No.  (Id. at 19-20)

Clearly, Petitioner understood that his plea agreement was limited to the written document

and the Court would select a sentence after consideration of the presentence report.  The

Court would not be bound by any agreement between the government and the Petitioner.

Any agreement which may have existed prior to the written plea agreement was

obviously superceded by the written plea agreement.  Petitioner signed the plea agreement

and acknowledged its terms in open court at the change of plea hearing.  Petitioner, under

oath, denied any other agreement terms.  Thus, any purported conflict of interest on the

part of defense counsel relating to a prior unexecuted agreement, did not inure to the

prejudice of the Petitioner.  Indeed, Petitioner specifically acknowledged "that it is in his

strategic best interests to enter into this agreement in its entirety rather than to proceed to

trial in this case."  (Id. at 18).  This claim is without merit.

(b)  Defense Counsel Failed to Hold the Government to its Original Plea Offer

Petitioner claims that the government initially offered a plea agreement with a

guaranteed five year prison sentence, but reneged on that offer.[3]  Petitioner says that he subsequently accepted a second plea offer, which resulted in a sentence of 135 months of imprisonment.  He complains that his counsel was ineffective in failing to hold the government to its original offer.  This claim suffers from a multitude of defects.  The argument was heard in the sentencing court in the context of Petitioner's motion to withdraw his guilty plea.[4]  Both the Assistant United States Attorney and Petitioner's counsel denied, in open court, that any such offer was made.  Mr. Aubin, Petitioner's attorney, stated "Yes.  I think, before the United States speaks, a couple of things I have to put into the record.  One, the deal that was offered Mr. Ashley was always the deal from the United States.  We had talked about whether he would get less with Mr. DiPuccio and Mr. Claytor, and I was told by Mr. Claytor when we got the plea this was as good as it was going to get.  That was after months of talking and dealing.  Three counts that were part of the plea, they were never going to be any better.  We talked about whether we could get something less, but we couldn't," id. at 9.  At the sentencing, Assistant United States Attorney Claytor stated "I have not promised anybody anything," (Doc. No. 81 at 25).  He

---

[3]In the transcript of Petitioner's sentencing hearing, he says that there was an agreement for a seven year sentence, (See Doc. No. 51 at 24).

[4]"About a week later, the attorney brought me, Mr. Aubin brought me their first deal.  I was going to be charged with one count of income tax evasion, one count of mail fraud.  Worksheets showed about a 60 month sentence.  I agreed, told the attorney 'Get it in writing.'  Two weeks later, a written deal came back.  They decided to add one more count of mail fraud, making the guideline range seven to nine years, with a lower end recommended. I objected and said, 'What happened to the five-year deal?  I was told a seven to nine was as good as it gets.  The government threatened, if I didn't sign it, the punishment would be greater.  I reluctantly signed it.  I still maintained I wasn't guilty of mail fraud." (Doc. No. 50 at 5-6).

later stated "[t]he plea agreement made it clear there were no promises made to Mr.

Ashley.  It was clear in the plea agreement that the sentencing was solely up to the Court

in this matter.  I made no promises to anyone.  No one else made any promises to Mr.

Ashley," id. at 27.

In fact, Petitioner specifically acknowledged his concurrence with and

understanding of the terms of the plea agreement at the change of plea hearing

> THE COURT:  Next then I want to talk with you
>
> about the consequence (sic) of the plea.  Do you understand
>
> that the maximum penalty under count one is a term of up to
>
> five years imprisonment, a fine of up to $250,000 or twice
>
> the pecuniary gain to the defendant or loss to the victim, plus
>
> three years of supervised release, plus restitution and a
>
> mandatory one hundred dollar assessment?
>
> THE DEFENDANT:  Yes.
>
> THE COURT:  Do you understand that the maximum
>
> penalty under count two is exactly the same penalty as
>
> that under count one that I just advised you of?
>
> THE DEFENDANT:  Yes.
>
> THE COURT:  And do you understand that the
>
> maximum penalty under count three is a term of up to
>
> five years imprisonment, a fine of up to $250,000 or

11

twice the pecuniary gain to the defendant or loss to

the victim, plus three years of supervised release, a

one hundred dollar special assessment, which is

mandatory, plus restitution and plus forfeiture?

       THE DEFENDANT:  Yes.

       THE COURT:  Do you understand that the Court

can order that the penalties imposed on these charges

be served consecutively, that is one after another?

       THE DEFENDANT:  I understand that.

(Doc. No. 5 at p.10).

****

       THE COURT:  Do you understand that, if the

Court accepts your plea of guilty, it can impose the

maximum penalty?

       THE DEFENDANT:  Yes.

       THE COURT:  Do you have any other federal or state

charges pending against you?

       THE DEFENDANT:  I have a federal case pending

against me for probation violation in Judge Rice's in Dayton,

Ohio, and that's been active since, I believe, '86.

       THE COURT:  All right.  Then do you understand

12

that the Court can order that the penalty imposed on

these charges be served consecutive to, or after, any

other state or federal sentence of confinement to which

you may be subject.

THE DEFENDANT:  Yes.

THE COURT:  Do you understand that, if your

plea of guilty is accepted, the Court can impose the

same penalty as though you pleaded not guilty, stood

trial and were convicted by a jury?

THE DEFENDANT:  Yes.

(Id. at 11).

****

THE COURT:  Then next I want to discuss with

you what we call guideline sentencing.  Under the

Sentencing Reform Act of 1984, the United States

Sentencing Commission has issued guidelines for

judges to follow in determining the sentence in a

criminal case.

Have you and Mr. Aubin talked about how the

Sentencing Commission Guidelines might apply to

your case?

13

THE DEFENDANT:  Yes.

THE COURT:  Do you understand that the Court will not be able to determine the guideline sentence for your case until after the presentence report has been completed and you and the government have had an opportunity to challenge the facts and conclusions reported by the probation officer?

THE DEFENDANT:  Yes.

THE COURT:  Do you understand that the Court is not bound by any stipulation of facts between you and the government, and the Court may, with the aid of the presentence report, determine the facts relevant to sentencing?

THE DEFENDANT:  Yes.

THE COURT:  Do you understand that, after it has been determined what guidelines apply to the case, the judge has the authority in some circumstances to impose a sentence that is either more severe or less severe than the sentence called for by the guidelines?

THE DEFENDANT:  Yes.

(Id. at 12-13).

14

****

THE COURT:  Next then I want to inquire about
a plea agreement, and you should understand that proper
plea agreements are permissible and that you and all
counsel have a duty to disclose the existence and terms
of any such agreement.

Let me ask you first, Mr. Aubin, is there a plea
agreement in this case?

MR. AUBIN:  Yes, there is, Your Honor.

THE COURT:  Then, Mr. Claytor, I'm going to ask
you to summarize the essential terms of the plea agreement.

MR. CLAYTOR:  Thank you, Your Honor.  The plea
agreement in this matter provides that Samuel Alvin Ashley,
Jr., also known as Steve A. Adkins, understands his rights
to plead not guilty, to trial by jury, to confront and cross-
examine witnesses, and his right against compelled self
incrimination and to have 30 days to prepare for the trial.

The defendant waives these rights and pleads
guilty to a three-count superseding information charging
two counts of 18 U.S.C. § 1341, mail fraud, and one
count of 26 U.S.C. § 7201, tax evasion.  The maximum

15

penalty for each count is five years, $250,000, three years

of supervised release, a special assessment of one hundred

dollars and restitution.

The sentence in this case will be imposed by the

Court.  There is no agreement as to what that sentence will

be.  Sentencing in this case will fall under the Sentencing

Reform Act of 1984, making the Sentencing Guidelines

applicable.  The amount of loss for purposes of 2B1.1 is

over one million dollars.  The defendant has reviewed the

application of the guidelines with his attorney and

understands that no one can predict with certainty what

guideline range will be applicable in this case until after

a presentence investigation.

The defendant will not be allowed to withdraw

his plea if the applicable guideline range is higher than

expected or if the Court departs from the applicable

guideline range.

The government will not further prosecute the

defendant for any conduct prior to the date of this plea

agreement that was of the same course of criminal conduct

as the matter described in the factual resume´.

16

The United States attorney recommends the defendant be given a reduction of three levels for acceptance of responsibility.  The defendant fully understands that this recommendation is not binding on the Court and the final decision on his reduction shall be determined by the sentencing judge.

Once this plea agreement is signed, filed and accepted by the Court, the United States attorney will move to dismiss the indictment currently pending against the defendant for a violation of 42 U.S.C. § 408(a)(7)(B).

The statement of facts in this case is true and will be submitted to the Court as evidence.

The defendant has received meaningful and satisfactory explanations from his attorney concerning the plea agreement.  The defendant has concluded that it is in his strategic best interests to enter into this agreement in its entirety rather than to proceed to trial in this case.

The plea of guilty is freely and voluntarily made and not the result of force or threats or promises.  There

17

<u>have been no representations or promises from anyone</u>

<u>as to what sentence this Court will impose</u>.

(<u>Id.</u> at 15-18).

\*\*\*\*

Finally, <u>this document is a complete statement of</u>

<u>the agreement in this case and may not be altered unless</u>

<u>done so in writing and signed by all parties</u>.

The agreement was signed on July 26th by Samuel

Alvin Ashley, Jr., also known as Steve Adkins, by his

attorney Norm Aubin, and also by myself on the same

date and also on behalf of John DiPuccio of our office.

THE COURT:  Thank you, Mr. Claytor.

Mr. Aubin, is that your understanding of the plea

agreement?

MR. AUBIN:  That is correct, Your Honor.  That

is our understanding of the plea agreement.

Having said that, I would just put in there that

there are certain facts that we believe, although not

germane to the plea of guilty, not germane to the

elements of the crime, which would be argued in the

PSI report, but, as far as the plea agreement goes, it

18

is in Mr. Ashley's best interests to go forward today

on this plea.

THE COURT:  Mr. Ashley, is that your

understanding of the plea agreement, and do you agree

with what Mr. Aubin just said?

THE DEFENDANT:  Yes.

THE COURT:  Has anyone made any other or

different promise or assurance of any kind that induced

you to plead guilty?

THE DEFENDANT:  No.

THE COURT:  Do you understand that any

recommendation of sentence agreed to by your counsel

and the government or any agreement by the government

not to oppose the sentence requested by your attorney is

not binding on this Court and that you might, on the

basis of your guilty plea, receive a more severe sentence

than requested or recommended?

THE DEFENDANT:  Yes.

THE COURT:  Aside from the plea agreement we

have just discussed, has any person, including an officer

or agent of the government or any of the lawyers in this

19

<u>case, promised or even suggested that you will receive a</u>

<u>lighter sentence or any other form of leniency if you</u>

<u>plead guilty</u>?

THE DEFENDANT:  No.

(<u>Id.</u> at 19-20, emphasis added).

The Court notes that throughout these exchanges, Petitioner was under oath. Petitioner's current argument that he was somehow bamboozled into accepting this plea agreement stretches credulity beyond the breaking point.  Nowhere does Petitioner in this hearing mention the so-called first plea offer.  In his current pleadings, he claims that Mr. Claytor gave one or more interviews to the press where he stated that Petitioner's sentence would be seven years.  (<u>See</u> Doc. No. 81 at 24-25 and Doc. No. 103, Exhibit U).  This he posits corroborates Petitioner's claim of a guaranteed sentence.  Mr. Claytor, however, categorically denies giving any such interviews.  (<u>Id.</u> at 27).  Regardless of the truth as to these allegations, the unrefuted facts show that Petitioner voluntarily entered guilty pleas with no guaranteed sentence or other auxiliary promises, and that he did so knowingly and voluntarily.  This claim to the extent that it was not waived by failure to raise it in Petitioner's direct appeal is meritless.[5]

---

[5]Petitioner also claims that he was misled into believing that his federal charge of probation violation would not be prosecuted in partial consideration of his guilty pleas.  A review of the plea agreement and the change of plea transcript reveals no such agreement.  To the contrary, Petitioner acknowledged that no other promises of any kind were made to induce him to plead guilty.  (<u>See</u> Doc. No. 51 at 19-20).  The Sixth Amendment does not require defense counsel to perform acts of magic whereby the facts may be transformed into something supportive of Petitioner's wishful thinking.  Moreover, defense counsel is not alleged to have

Petitioner's claim that his defense counsel should have withdrawn from his representation when it became clear that his memory of the plea negotiations differed from Petitioner's memory is also a feckless argument. Defense counsel, as an officer of the Court, may not falsely confirm Petitioner's version of the facts. Defense counsel's acknowledgment that only one plea offer was extended by the government to Petitioner was not privileged information, because it involved communication between the government and defense counsel, rather than defense counsel and Petitioner. Petitioner himself placed his attorney in an untenable position by calling upon him to testify as to the plea negotiations in open court. Defense counsel's performance in this situation did not fall below the standards of practice demanded by the Sixth Amendment nor did his response to Petitioner's question prejudice the case.

(2) Defense Counsel Lied to the Defendant and the Court

Petitioner, in a related claim, argues that defense counsel lied to him and to the Court regarding the existence of a plea agreement that preceded the one which he executed in writing and acknowledged in open court at the change of plea hearing. For all of the reasons set forth in Section I, (B)(1) supra, the Court finds that Petitioner's claim is not supported by the record. It is specifically denied by Assistant United States Attorney Claytor, "[t]he plea agreement made it clear there were no promises made to Mr. Ashley.

---

been ineffective in connection with this side issue. The Court notes, however, that failure to raise this issue on direct appeal forecloses review in this procedural posture. This claim was waived by its omission on direct appeal.

It was clear in the plea agreement that the sentencing was solely up to the Court in this matter. I made no promises to anyone. No one else made any promises to Mr. Ashley." (Doc. No. 81, Tr. p.27). It could not have inured to Petitioner's detriment. Thus, he suffered no prejudice from defense counsel's alleged actions. This claim is meritless.

(3) <u>Defense Counsel Failed to Utilize a Court Appointed Psychologist</u>

Petitioner claims that defense counsel's performance was constitutionally deficient in that he failed to utilize the services of a psychologist to evaluate Petitioner's "severe emotional condition" (Doc. No. 103 at 10). Petitioner claims that he suffered from a severe gambling addiction which should have been brought to the Court's attention in an effort to reduce the sentence imposed. Petitioner's claim founders on two bases. Factually, Petitioner is not an accurate historian of his own case. The record reflects that the Court was made aware of Petitioner's proclivity to excessive gambling. Indeed, the Judge stated at the sentencing hearing

"Mr. Ashley alleges that he suffers from a severe gambling addiction. As can be seen from interviews with law enforcement officials after his arrest and in his presentence report, the major factor in this theft, Mr. Ashley contends, was his gambling addiction. Similar to his substance abuse, Mr. Ashley believes that consideration for his severe emotional condition should be given by the Court in the form of a downward departure.

The Court finds that in this particular case that Mr. Ashley's

22

> gambling addiction and/or substance abuse does not take the case
>
> out of the heartland of other cases that are similar.  Therefore,
>
> downward departure will not be granted, especially in this case
>
> which was such a huge fraud

(Doc. No. 8 at 18-19).[6]  Although Petitioner has cited no authority for a downward

departure as a result of such a condition, the Court is aware of the Sixth Circuit's ruling in

United States v. Sadolsky, 234 F.3d 938 (2000),[7] where the district court granted a

downward departure based upon the defendant's significantly reduced mental capacity

related to his gambling problem, based upon the testimony of defendant's wife and of a

member of Gamblers Anonymous.  In that case, as here, there was no testimony from a

medically trained professional who was qualified to diagnose gambling disorders.  The

Court stated that such testimony would have been preferable, but nevertheless chose to

downwardly depart despite the absence of expert testimony.  In this case, Judge Dlott

clearly understood her option to downwardly depart, but chose not to do so.  The

government offered no evidence to contradict Petitioner's claims of gambling and narcotics

addictions.  Indeed, the government corroborated Petitioner's claims by sharing Petitioner's

wife's statements to that effect.  (See Doc. No. 51 at 21).  This Court sees no prejudice to

Petitioner from a lack of expert testimony on this point.  The extent of

---

[6]See also Doc. No. 50 at 11, 13 (co-defendant, Tina Swain, Petitioner's wife, told law enforcement officials "that they took 70 to 80 percent of the charitable donations that came in and used them for his gambling problem and his narcotics use").

[7]But see United States v. Kim, 313 F. Supp. 2d 298 (2004).

23

Petitioner's addiction was undisputed, but in the end, unpersuasive for the Court.[8]

Petitioner offers nothing to persuade the Court that the sentencing judge might have

chosen to exercise her discretion differently on this point if she had had the benefit of

expert testimony. Thus, he has shown no prejudice from the absence of corroborating

expert testimony, especially in light of the government's concession as to his gambling and

narcotics addictions. This claim is meritless.

    (4)  <u>Defense Counsel Failed to File for Discovery, Failed to Properly Utilize Court</u>

          <u>Appointed Certified Accountant</u>

---

    [8]The Court notes that on November 1, 2003, (just eight months after Petitioner's sentencing hearing) a new version of the Sentencing Guidelines became effective. In that version the Sentencing Commission specifically stated "[d]rug or alcohol dependence or abuse is <u>not</u> a reason for a downward departure" (Sec. 5H1.4). Additionally, the Guidelines state that "[a]ddiction to gambling is <u>not</u> a reason for a downward departure." <u>Id.</u> (emphasis added).

    At Sec. 5K2.0(d), Prohibited Departure, the Guidelines reiterate

notwithstanding subsections (a) and (b) of this policy statement,
or any other provision in the guidelines, the court may not depart
from the applicable guideline range based on any of the following
circumstances:

    (1)     Any circumstance specifically prohibited as a ground for departure in §§5H1.10
           (Race, Sex, National Origin, Creed, Religion, and Socio-Economic Status),
           5H1.12 (Lack of Guidance as a Youth and Similar Circumstances), the third and
           last sentences of 5H1.4 (<u>Physical Condition, Including Drug or Alcohol</u>
           <u>Dependence or Abuse; Gambling Addiction</u>), the last sentence of 5K2.12
           (Coercion and Duress), and 5K2.19 (Post-Sentencing Rehabilitative Efforts).
           (Emphasis added).

Thus, Judge Dlott's decision was clearly in line with the Guidelines' direction as subsequently clarified.

Petitioner claims broadly that defense counsel was ineffective for failing to contest the amount of loss computation used at his sentencing. However, his own rambling explanation of the gaps in the calculations by the government and the probation department, when comprehensible, only supports the presentence report

THE DEFENDANT: Thank you again, Your Honor.

On page five of the presentence investigation, there is a little chart that they have thrown up there, if we could look at that for a minute. In the year 1995, the first year on the chart --

THE COURT: Is it page five or paragraph five?

THE DEFENDANT: I'm showing page five, Your Honor, up top.

THE COURT: Okay. I see it.

THE DEFENDANT: This is, however they get whatever they got, this is where they're putting it at. In 1995, they're showing that the food center deposited only 45,000 some odd dollars, but yet they claimed that we brought in 268. That puts us in the -- overdrawn $223,000.

Now, any simple accounting practice, they're going to -- and that right there should show that their figures are wrong. That alone, if they think we operated at a $223,000 deficit for a year, that has to show their figures are wrong.

25

Then they didn't even bother to subtract that from the so-called profits of '96 and '97. That would make it zero and reduce '98 by another $20,000. Then, for '99 and 2000, their claim is, because no form 990 was filed, I must have stole all that $900,000. Impossible, mathematically impossible, and they know it.

Then try to cover their tracks. If you look down to 30, paragraph 30, same page, they have got this total deposits of 2.2. And that's wrong, too. They count the same money twice. But on paragraph 30, here we go with this 80 percent again. 80 percent of this 2.2 million, they now say they have reduced it down to 1.7 million.

THE COURT: Mr. Ashley, can you hold on for a second?

THE DEFENDANT: Absolutely.

(Interruption)

THE COURT: I'm sorry.

THE DEFENDANT: Okay. Back to paragraph 30 on page five. They talk about this 80 percent, 1.7 million, and then somehow they decided in the interest of justice, in the same paragraph, they're going to take it down to a million

26

65,000 dollars.  So we're $65,000 over a million.

Now, they use yet other figures, if you would please turn to page nine -- I'm sorry.  Where is that other chart?

THE COURT:  Page seven?

THE DEFENDANT:  Is there a chart on seven?  Yes, ma'am.  Thank you.

Now, here's a bunch more really weird figures they come up with.  They claim that in '96 through 2001, those figures across the top is how much I, quote, stole from the food center.  And the paragraph right below that they're showing a figure here of $691,528.744.  It says Ashley has a total taxable unreported income of that; I owe them $208,000 in back taxes.  Even if you add the paragraph below that, it's still not a million dollars.

They use -- every page you go to where they talk about figures, it's a different figure.  It's either over a million, which it's not, or it's under a million.  It can't be 691,000 on this page, 2.2 on this page, 1.7 and, oh a million 65.

And they go back too far on the figures.  It's a six-year statute of limitations.  They're going back

27

further than the statute allows them to to (sic) even add

them up to a million.  It's not a million dollars.  I -- I just

can't -- I just don't know what else I can say other

than they provided no supporting documents to

support their spread sheets that they used to calculate.

And it's, like I said, it's a different figure on whatever

page.

Okay.  That's it with the figures.

(Doc. No. 50 at 22-24).

Petitioner conflates the various financial data to arrive at illogical conclusions.  For

example, he points out that the chart on page 5 of the presentence report (paragraph 27)

shows that although Form 990 showed receipts in the amount of $268,500.00, only

$45,557.92 was deposited to the charity's bank account.  He characterizes this as showing

an overdraft of $223,000.00.  While that extraordinary spin might have some superficial

appeal, it is obvious that the point is that while the charity received large sums of money

from 1995 through 2001, tax forms and bank deposits varied wildly, giving rise to a

reasonable and unrebutted inference that Petitioner and his co-defendant misappropriated

large sums.  Stating that it is "impossible" does not make it so, nor is it a substitute for

hard evidence.

Petitioner does not, nor can he, seriously dispute the total bank deposits of

$2,224,970.14 shown in the chart.  Petitioner does not deny that both he and his co-

28

defendant estimated that 80 percent of the total receipts were diverted for his personal use, amounting to $1,779,976.11. Paragraph 30 of the presentence report then sets out the facts gleaned from "checks, debit card transactions and ATM withdrawals" from the charity's accounts into Petitioner or his co-defendant's personal accounts amounting to $1,065,219.62. The presentence report "in the interest of justice" calculated Petitioner's offense level based upon this lowest of the possible loss calculations. Petitioner attempts to show these various numbers as evidence of the government's manipulation of the data to his detriment. On the contrary, Petitioner clearly seems to be the beneficiary of a generous downward adjustment in the loss calculation. A calculation which, upon review by this Court, could easily have gone against Petitioner's interests. He has no legitimate complaint regarding the calculations in this paragraph.

Petitioner complained about the chart and figures for unreported income and taxes due in paragraph 37. However, he does not distinguish unreported income from reported income. Petitioner's arguments are "sound and fury signifying nothing."[9] The complaints are unsupported by any evidence or even cogent argument. Petitioner has made no effort, other than his own comments, to show any irregularity in the presentence report's financial calculations.

Additionally, Petitioner wholly ignores the terms of his plea agreement and the statement of facts that was incorporated into it. The plea agreement states that "[t]he

---

[9]William Shakespeare, The Tragedy of Macbeth, Act V, Scene V (1623).

amount of loss for purposes of Sec. 2B1.1 is over One Million Dollars," (Doc. No. 24 at 2). It goes on to say that "[t]he Statement of Facts in this case is true and correct and will be submitted to the Court as evidence," id. at 4. This agreement was specifically referenced at length during Petitioner's change of plea hearing. Mr. Claytor, the Assistant United States Attorney, stated that "[t]he amount of loss for purposes of 2B1.1 is over one million dollars," (Doc. No. 51 at 16). Petitioner concurred in Mr. Claytor's summary of the plea agreement without any objection. Id. at 19. Thereafter, Special Agent Voorhees of the IRS Criminal Investigation Section provided the Court with a reading of the agreed statement of facts in which he stated that "[t]he amount of funds taken by Mr. Ashley under false pretenses and used by him to support his lifestyle was over $1,000,000. Mr. Ashley did not pay federal income tax on his ill-gotten gain in the year -- in the 1999 tax year, he willfully evaded his taxes of $43,409.42, which amount is due and owing," id. at 21-22.

Thereafter the following exchange occurred

THE COURTROOM DEPUTY: Thank you very much, Mr. Voorhees.

Mr. Ashley, let me ask you, did you hear what the agent just said?

THE DEFENDANT: Yes.

THE COURT: Is what he said correct?

THE DEFENDANT: For the purpose of this hearing,

it's in my best interest to accept those facts.

      MR. AUBIN:  That is correct, Your Honor.  Mr.

Ashley is admitting to those facts for the purpose of this

hearing, as I said previously.  There are certain arguments

that could be made as part the PSI report, but they do not go

to the actual plea of guilty today.

      THE COURT:  All right.  So what you're leaving to

work out with the probation officer, I take it, is the amount?

      MR. AUBIN:  It is the amount, Your Honor.  Both parties

believe that would be a subject for the PSI report rather than a

plea of guilty today.

Id. at 22.

     In the end, Petitioner never adduced any evidence to undermine the accuracy of the

probation officer's calculations.  In his § 2255 petition, he implies that his co-defendant

wife's gambling winnings were erroneously included as part of his income.  This is an

argument never made before the sentencing judge and Petitioner does not allege that his

defense counsel was made aware of such a claim.[10]  Moreover, Petitioner fails to offer any

---

[10]The Court wonders how Petitioner knew that his wife's gambling winnings were
included in the calculation of his misbegotten monies as he alleges, if as he further alleges, he
was denied discovery on the government's underlying data used to calculate his relevant conduct
gain or loss.  Similarly, Petitioner's claim that other outside income was incorrectly included in
the government's calculations comes too late and without verification or specificity.  This claim
is waived for failure to raise it upon direct appeal as well as meritless.

proof of this claim or to even quantify the claim.  Petitioner points to nothing that could

have or should have been discovered by his defense counsel that would have changed the

loss calculation.  As the Court of Appeals stated "[t]he district court had before it

uncontradicted evidence from an Internal Revenue auditor, bank records, and statements

from Ashley himself from which it drew the conclusion that Ashley's crimes netted him at

least one million dollars.  While Ashley had no burden to disprove any such allegation

initially, he was completely unable to rebut this figure even with the aid of a court-

appointed accountant.  There is thus nothing in the record before this court from which one

could conclude that the district court made a mistake in reaching this loss valuation."

United States v. Ashley, No. 03-3502, 2004 WL 540469 at *5 (6th Cir. Mar. 17, 2004).

Petitioner's contention that defense counsel failed to ensure that he would have the

opportunity to personally speak with the court-appointed accountant falls short of showing

any prejudicial consequence to Petitioner.  He fails to say what he might have imparted to

the accountant that would have impacted the Court's loss calculation.  He does not specify

what, if anything, he told his attorney that the accountant should know before analyzing the

loss data.  This claim of ineffective assistance of counsel is, therefore, meritless.

    (5)  Defense Counsel Failed to Protect the Defendant Under USSG § 1B1.8(a)

    Petitioner claims that his defense counsel was constitutionally ineffective by failing

to protect him under USSG § 1B1.8(a).  This claim may be resolved easily.  It was a subject

of Petitioner's appeal to the Sixth Circuit and was definitively resolved by that Court.

    On appeal, counsel for Ashley brings three claims for review.  The

32

first claim is that the district court erred in relying on immunized
information gleaned from Ashley to determine sentencing enhancements.
USSG § 1B1.8(a) provides, in relevant part, that self-incriminating
information shall not be used in determining the applicable sentencing
guideline range when a defendant's cooperation is predicated on an
agreement with the government that self-incriminating information
provided pursuant to the agreement will not be used against the defendant.
Section 1B1.8(a) thus "unquestionably forbids the government to
influence the sentencing range by disclosing revelations made by a
defendant in the course of cooperation as required by a plea agreement."
*United States v. Jarman*, 144 F.3d 912, 914 (6th Cir. 1998) (citing
*United States v. Miller*, 910 F.2d 1321, 1325 (6th Cir. 1990)).  Plea
agreements are contractual in nature.  This court applies traditional
principles of contract law in the interpretation and enforcement of a
plea agreement.  *United States v. Robison*, 924 F.2d 612, 613 (6th Cir. 1991).

A review of the four corners of the written plea agreement shows
that Ashley did not commit to, and the government did not demand
from him, an explicit cooperation agreement so as to trigger the
protections of USSG § 1B1.8(a).  There is no evidence of any such
agreement other than Ashley's unsupported, impassioned statements
to this effect at hearings following the revelation that he was
going to receive a higher sentence than he expected.  Traditional
contract law principles, and the complete absence of any other
support for this claim, would preclude this court going outside
the plain language of the agreement.  This claim lacks merit.

Id. at 4.

The Court also notes that the Petitioner's plea agreement only provided that "[t]he

government will not further prosecute the defendant for any conduct prior to the date of this

Plea Agreement that was part of the same course of conduct as the matters described in the

Factual Resume´," (Doc. No. 24 at 3).  Gleaning relevant conduct information on the loss

for these crimes is not "further" prosecution.  It does not involve the filing of additional

charges.  Petitioner's claim of ineffective assistance of counsel on this basis is meritless.

(6)  Defense Counsel Failed to Promptly Turn Over His Complete Case File

Petitioner claims that his defense counsel failed to turn over his complete case file to Petitioner upon demand.  Whether true or not, Petitioner has not alleged any consequential prejudice, nor does this rise to the level of a failure to provide the defense contemplated by the Sixth Amendment.  This claim is meritless.

C.  Application of Booker

Petitioner has also separately argued that he is, at the very least, entitled to resentencing in light of the Booker decision.  The Court takes note that Petitioner's direct appeal concluded with the decision of the Sixth Circuit affirming the sentencing court in all respects on March 18, 2004.  The Booker decision was issued by the Supreme Court on January 12, 2005, and the Sixth Circuit has concluded that Booker applies only to cases pending on direct appeal at the time the decision was handed down.  It does not apply retroactively to cases pending on post-conviction motions such as Petitioner's present motion.  See United States v. Humphress, 398 F.3d 855 (2005).  Thus, this claim is without merit.[11]  In his own reply to the government's response, Petitioner stated that "Apprendi was decided several years before the defendant was sentenced," Doc. No. 122 at 1.  Nevertheless, Petitioner did not raise this issue in his direct appeal.

> [O]n appeal, counsel for Ashley brings three
> claims for review.  The first claim is that the district
> court erred in relying on immunized information

---

[11]Petitioner's argument titled "Illegal Sentence" is addressed to the potential effects of the application of Apprendi and Booker to this matter.  Neither argument has merit.

gleaned from Ashley to determine sentencing
enhancements.

United States v. Ashley, No. 03-3502, 2004 WL 540469 at *3-4 (6th Cir. Mar.

17, 2004).

The second claim is that there was insufficient
evidence adduced to support the district court's
conclusion that there were more than fifty victims
of Ashley's crimes for sentencing purposes.

Id. at 4.

The final claimed error is the amount of loss
involved in the scheme.

Id. at 5.

Petitioner has waived any claim that he might have had under Apprendi by failing to

raise the issue on direct appeal, since a § 2255 petition will not serve as a substitute for a

direct appeal, and claims that could have been raised on direct appeal, but were not, will not

be entertained in a § 2255 proceeding.  See McCrary v. United States, No. 97-3966, 1999

WL 313831 (6th Cir. May 3, 1999).

D.  Cruel and Unusual Punishment

Petitioner claims in a vague argument that somehow his sentence violates the Eighth

Amendment prohibition against cruel and unusual punishments.  His argument amounts to

little more than his own subjective assessment that the sentence should fail for lack of

comparators, i.e. his case was not compared to other similar cases and defendants.  The

Court has already disposed of the <u>Booker</u> argument, and this other prong of Petitioner's claim yields no strength to his position. One of the paramount purposes of the United States Sentencing Guidelines is to assist sentencing courts in selecting sentences that will be similar to those sentences imposed in other similar cases for other similar defendants. Here, the sentencing judge chose Petitioner's sentence from the range provided by the Guidelines. Virtually by definition, Petitioner's sentence is neither excessive, nor cruel, not disparate. This claim also is meritless.

     E.  <u>Illegal Search and Seizure</u>

     Petitioner mentions that the government seized his computer in what he characterizes as an illegal warrantless search. He goes on to allege that the information stored in the computer allowed the government to further develop its calculation of the relevant conduct loss for purposes of the Guidelines. This argument is meritless for several reasons. There was no motion to suppress this evidence filed by Petitioner in the sentencing court. In fact, Petitioner pled guilty to a superseding information, thus waiving any such challenges to the government's case. He did not raise the issue on direct appeal. He does not allege that his defense counsel should have challenged the legality of this seizure. Thus, if Petitioner had such a claim, it is waived.[12]

     F.  <u>Offense Level Enhancements for Obstruction of Justice and Number of Victims</u>

     Petitioner also mentions his objection to the probation officer's enhancement of his

---

     [12]The Court notes that this laptop computer was forfeited to the government pursuant to specific provisions in the plea agreement. (<u>See</u> Doc. No. 24 at 5).

offense level for obstruction of justice for destroying records subpoenaed by the grand jury.

Additionally, he objects to the offense level enhancement for more than 50 victims.

Neither of these matters are properly before this Court. The sentencing judge resolved

these issues against Petitioner at the motions hearing before sentence was imposed and the

ruling on the obstruction of justice enhancement was never appealed. The number of

victims enhancement was appealed and has been definitively resolved by the court of

appeals against Petitioner:

> [t]he district court had before it the unchallenged statement of a
> United States Postal Inspector that Ashley's mail fraud victimized
> "hundreds, if not thousands" of individuals. In addition, Ashley
> realized a portion of the proceeds in this scheme through a "jug bottle"
> collection of coins at various locations, a system virtually designed to
> involve scores of donors contributing small amounts of money at any
> one time. Ashley's defense to this finding is largely based on the
> inability of investigators to reconstruct business records ordered
> destroyed by Ashley once he became aware that he was under scrutiny.
> The district court's decision in this regard was not clearly erroneous.

United States v. Ashley, No. 03-3502, 2004 WL 540469 at *5 (6th Cir. Mar. 17, 2004).

Neither of these issues survives to be reviewed by this Court. The Court further notes that

Petitioner has alleged no lapses on the part of his defense counsel in connection with either

of these two issues.

    G. District Court Lacked Subject Matter Jurisdiction

    Petitioner's argument that the district court lacked subject matter jurisdiction over

the crime of tax evasion for lack of an implementing regulation for the pertinent section(s)

of the Internal Revenue Code is a theory so thoroughly discredited that it does not merit

analysis.  The Internal Revenue Code "fully defines the criminal conduct it prohibits and therefore does not contemplate that regulations will be promulgated to define further substantive obligations beyond those created by the Code."  United States v. Washington, 947 F.Supp. 87, 91 (S.D.N.Y.1996)(citing United States v. Hicks, 947 F.2d 1356, 1360 (9th Cir. 1991)).  "It is the tax code itself, without reference to regulations, that imposes the duty to file a tax return."  United States v. Bowers, 920 F.2d 220, 222 (4th Cir. 1990).  The Petitioner has simply evaded income taxes, and his duty to pay those taxes is manifest on the face of the statutes, without any resort to IRS rules, forms, or regulations.  The issue was thoroughly addressed in United States v. Langert, 902 F.Supp. 999, 1002 (D.Minn. 1995), wherein the court recognized that Title 26 U.S.C. § 7805(a) broadly authorizes the Commissioner of the Internal Revenue Service to prescribe all "needful" rules and regulations for the enforcement of the Internal Revenue Code, and to promulgate, as necessary, any interpretive regulations.  There, however, as here, the petitioner failed to identify any ambiguity in any section of the code pertaining to individual income tax which requires the promulgation of interpretive regulations. Id. at 1003 (citing Title 26 U.S.C. §§ 1, 6012, 6013, 6071(a), 6072(a), 6151(a)). Petitioner has ignored the clear import of the Code, as it statutorily requires him in clearly unmistakable terms, to file accurate, individual income tax returns.

H.  Due Process Right to Call Witnesses

Petitioner's claim that the district violated his due process rights by denying him the right to call the case agents at his sentencing hearing to corroborate his allegations of

extensive proffers unfairly used against him in calculating the losses involved in this matter

is meritless.  This matter was resolved by the Court of Appeals (see <u>supra</u> at (B)(5)) and, in

the alternative, assuming arguendo that the Court of Appeals did not speak to this issue in

precisely these terms, it has been waived by Petitioner's failure to raise it in his direct

appeal.  Additionally, as stated <u>supra</u> at (B)(5), Petitioner was only protected from the filing

of additional charges, not from the use of his volunteered information for sentencing

purposes.

I.  <u>Cumulative Effect of Petitioner's Claims</u>

The Court finds nothing amounting to an error of constitutional magnitude nor any

assemblage of non-constitutional errors that would in their totality render the entire

proceedings invalid such as to justify relief to Petitioner.

Petitioner has not demonstrated the need for further discovery, appointment of

counsel or an evidentiary hearing.

<u>Conclusion</u>

For all of the reasons discussed <u>infra</u>, Petitioner's Motion to Vacate under 28 U.S.C.

§ 2255 (Doc. No. 103), Amendment to his Previously Filed § 2255 (Doc. No. 116), and

Permission For Leave to File a Second Amendment to the Defendant's § 2255 (Doc. No.

124) are all **DENIED** as not being well-taken.[13]

---

[13]The Court has granted Petitioner leave to file a Second Amendment to his § 2255 petition (Doc. No. 124), but finds the newly argued grounds in the amendment meritless as those discussed <u>supra</u>.

IT IS THEREFORE ORDERED THAT:

1.  Petitioner's petition to vacate his convictions and sentence pursuant to 28 U.S.C. § 2255 (Doc. Nos. 103, 116 and 124) are **DENIED** with prejudice.

2.  A certificate of appealability will issue with respect to Petitioner's claims of ineffective assistance of counsel (B)(1)(a) and (b), (2) & (3) ONLY.  A certificate of appealability will not issue with respect to any of Petitioner's other claims for relief because, for the foregoing reasons, Petitioner has failed to make a substantial showing of the denial of a federal constitutional right remediable in this proceeding.  See 28 U.S.C. § 2253(c); Fed. R. App. P. 22(b).

3.  With respect to any application by petitioner to proceed on appeal *in forma pauperis*, the Court certifies pursuant to 28 U.S.C. § 1915(a)(3) that an appeal of this Order would be taken in "good faith," only as to those issues enumerated supra and therefore **GRANTS** Petitioner leave to appeal *in forma pauperis* ONLY as to those issues.  See Fed. R. App. P. 24(a); Kincade v. Sparkman, 117 F.3d 949, 952 (6th Cir. 1997).[14]

DATE:   January 9, 2006                              s/ Sandra S. Beckwith
                                                     Sandra S. Beckwith, Chief Judge
                                                     United States District Court

---

[14]Petitioner has filed an additional motion related to his § 2255 petition, Motion for Discovery Under Rule 6 (a) of § 2255 Proceedings (Doc. No. 111), the government has filed United States' Response to Defendant's "Motion for Discovery" (Show Cause Order) (Doc. No. 113) and Petitioner has filed Defendant's Reply to Government's Request to Dismiss Defendant's Motion for Discovery (Doc. No. 114) (all pleading titles are verbatim).  This motion is MOOT in light of the Court's denial of Petitioner's § 2255 motion.